UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK

_____

MARIAH LOPEZ                                             **COMPLAINT & TRO**

V

U.S. DEPARTMENT OF THE INTERIOR,                       **INDEX NO_____**

NATIONAL PARK SERVICE,

HUDSON RIVER PARK TRUST,

NEW YORK STATE EXECUTIVE CHAMBER,

NEW YORK STATE DEPARTMENT OF PARKS

RECREATION & HISTORIC PRESERVATION,

_____

## COMPLAINT INCLUDING REQUEST FOR TRO & INJUNCTIVE RELIEF

1.Plaintiff alleges the Defendants are in violation of:

**2.The United State's Constitution; First, Fourth, and Fourteenth Amendments (among others);**

**3.The Constitution of the State of New York; Article I, Sections (6)(8) and (11), among others;**

**4. The National Historic Preservation Act; Section 106, and The**

**New York State Historic Preservation Act; Sections (14.00), (14.07) among others.**

**United States Department Of Transportation Act; Section 4F among others;**

**5.New York State Human Rights Law (sections related to and prohibiting Retaliation, as well as discrimination based on race, and gender expression).**

**6.This case and controversy focuses on Historic Resources within Hudson River Park, which are threatened by construction at Gansevoort Peninsula; and how NYS SHPO failed to perform duties under Section 106 of the National Historic Preservation Act.**

7.Two factors determine whether or not a construction or development project falls under the jurisdiction of the National Historic and New York Historic Preservation Acts respectively; 8. Does the project involve federal agencies and or funds? In this case and controversy the answer is yes. The U.S. Army Corp of Engineers.

9. II Does the project negatively impact or have the potential to negatively impact, sites and properties listed or eligible to be listed on the National or State Register of Historic Places? Again, the answer from a legal and regulatory perspective, is yes.

10.The area of Hudson River Park between roughly Christopher Street and what is now referred to as Gansevoort Peninsula, **meets and satisfies** the statutory definition and requirements to be classified as a Historic Resource under the National Historic Preservation Act; **being the birthplace and incubator of a disproportionate amount of (Black, Lantino, Transgender and Gender Non Conforming; Gay and Lesbian) American heritage, history and culture when one considers the areas relatively small size.**

11.The area was first nominated and submitted to the Federal government for review and nomination ( which should have triggered cooperative efforts between Federal and State agencies to study the area further) by Plaintiff in 2014 during an initiative under former President Obama, in which the United States Department of Interior and the National Park Service conducted a national study of LGBT history and Historic Resources.

12.Since that time the area's rich history has only grown in notoriety, and as have the stories of national historic figures associated with it (The Death and Life of Marsha P. Johnson, released in 2017).

**13.Today, a massive 75 million dollar construction project at Gansevoort Peninsula, which required the approval of the United States Army Corp of Engineers (among other agencies, placing the project squarely under the jurisdiction of the National Historic Preservation Act) threatens Historic Resources located within Hudson River Park.**

14.Plaintiff argues that the Assessment of Potential Effect (APE) conducted by the New York State Historic Preservation Office, as part of the agencies legal requirements and related tasks under section 106 of the NHPA, relating to Gansevoort Peninsula (as well as any other pro forma or legally required input or involvement from the agency) was flawed, deficient, inadequate; intentionally misleading, is essentially racist, sexist, classist and transphobic, and that any reports or assessments created and produced by the Defendant's, including but not limited to SHPO, **are designed as a rubber-stamp approval process, which favors wealthy white developers and interests,** over what would be the more cumbersome and less lucrative task of years long study

of the layered an nuanced American heritage and Historic Resources located within Hudson River Park.

15. This history within Hudson River Park, although "*colorful*", tells a story of oppression, pain, and suffering of tens of thousands of Americans. Areas within the park tell the story of thousands (if not millions) of marginalization of TLBTQ+ **who are descendants** of enslaved individuals; indidenous people, and immigrants from equatorial regions across the globe (those with Black and Brown skin), who call NewYork home. Through a rich underground tradition of oral-history, they (Black and Brown folk) all "found" this place, The Piers, for five decades. People of color from across the globe, passed along a "secret": if you are in New York City, you go to The Piers to find your own people.

16. The history of the Black and Brown TLGBTQ+ people associated with specific areas within Hudson River Park **is historically and ethnically distinct from that of white TLGBQ+ individuals and communities**; including but not limited to language, customs and traditions.

17. This history–and the Historic Resources associated with it– has been entirely ignored by Federal and State officials thus far where it clashes with construction plans within Hudson River Park.

18. Even if SHPO did not find that Gansevoort Peninsula itself was a Historic Resource or eligible to be studied and listed on either the Federal or State Register of Historic Places (which Plaintiff vehemently rejects), **Plaintiff is prepared to prove that the agency (supposedly in**

compliance with Federal law and regulations under NHPA) failed to accurately list and
assess every single aspect of history, culture and native tradition (ie Historic Resources)
which are threatened by the construction project at Gansevoort Peninsula, and/or which
are located within Hudson River Park (at the time the agency submitted its assessment
approval for construction of a man made beach at the location).

19.For every project involving a federal agency, SHPO must collaborate in the creation of an
Area of Potential Effect review, or APE.

20.As a part of this APR SHPO must review and assess: **all** areas impacted by the project which
contain, and/or **which might contain Historic Properties, including Historic Resources, as
defined by section 106 of the NHPA. The APE must assess and document all** foreseeable
**adverse effects on Historic Properties, to the public, as well as to local communities. SHPO
did not perform this function with regards to Gansevoort Peninsula.**

21.The view of the scenery (what can be seen and taken in with the naked eye), including the
landscape (and in this case the waterfront), enjoyed by communities**, and whether this view has
the potential to be radically altered and or adversely impacted by said construction, is
subject to inclusion, scrutiny and review via APE.**

22.The Piers (45 and 46 respectively, referred to as The Piers globally and through literature and
contemporary cinema) including their stunning views of the Hudson River, parts of New Jersey
and Northern Manhattan, are being adversely impacted by construction at Gansevoort Peninsula.

23.Black and Brown  TLGBQ+ individuals and communities have been gathering; impacting national and global events (including helping to shape local, state and federal law; American history art and culture), **all while taking in a historic view which can only be viewed from The Piers,** decades prior to when wealthy white developers found the land and area appealing, ripe for gentrification.

24.The view from The Piers **will be forever altered if construction at Gansevoort Peninsula is allowed to continue under current plans, which is creating an artificial landscape,** completely foreign to the natural history and human culture, civilization which has developed organically in the area  over half a century.

25.**The value and quality of the local culture and history is threatened, and will be degraded and harmed irreparably by the imposing, artificial presence of a man made beach at Gansevoort Peninsula. Such an attraction will create a new socio-ethnic dynamic in the area. TLGBQ+ communities will be replaced by white cis, hetero sunbathers.**

27.**Little Discovery is Needed In This Case**

This case and controversy happens to be unique for several reasons: One being the fact that Plaintiff is already in possession of a large amount of documents and records which can be considered discovery material (sure to expedite this case), which strengthen her arguments and likelihood of succeeding on the merits. **Plaintiff could be ready for trial in a matter of months.**

28.Plaintiff came into possession of these records and documents after initiating a Special Proceeding in Albany Supreme Court in February (Lopez v Hochul et al 781-22), challenging the failure of New York State officials with regard to executing their duties as per historic-preservation within Hudson River Park (related to the history and areas cited in this case). Generally there is no Discovery in Special Proceedings, and as such filings would be limited. However the Respondents (Defendants) submitted an inordinate amount of documentation which Plaintiff might have never come to possession of otherwise.

29.After Plaintiff (Petitioner) secured a TRO against Respondents blocking construction within the aforementioned areas within Hudson River Park while the court determined similar questions highlighted within this case, Respondents counsel from the New York Attorney General's Office filed an Emergency OSC to vacate the TRO. This motion **contained a vast number of exhibits which did not factually strengthen Respondents' position at all. Rather, they only served to undermine it. These filings also highlighted why any construction project at Gansevoort Peninsula falls under section 106 of the Historic Preservation Act, since the U.S. The Army Corp of Engineers is involved.**

30.In response to Respondent's Emergency OSC to vacate the TRO, the court heard oral arguments on March 21st, and lifted the TRO, but only "**to an extent**" and after Respondents argued that there was structural and engineering engineering work "underground" that needed to be completed, **which would not impact the area above ground (visible to the public ie those**

at The Pier nearby); that the work involved "wires and pipes". More infrastructure than design.

31.The AG's Office argued that construction of the above ground design elements for the area would **not be completed for quite some time**; a matter of months and potentially next year if any major delays occur with the underground preparation work.

32.When the court agreed to lift the TRO "to an extent" in order to allow engineering work to proceed underground, it did so with the understanding that parties would soon be before yet another judge (the third), assigned to decide the case on its merits.

33.After further review of the massive amount of documents filed by the Respondents (Defendants) to support their motion to vacate the TRO, as well as relevant state and federal law, Plaintiff discovered inadequacies and revisionist history within the review and assessment process under SHPO; falsehoods with regards to historic events and figures listed in the documents (or lack thereof); deliberate refusal of state officials to correct-course over the years, even as the Historic Resources within the park (and other history covered under Section 106) became household names. Enter the death of a civil rights icon and American hero (Marsha P Johnson).

**34.Within these documents and records about Gansevoort Peninsula Petitioner (Plaintiff) supplied by Respondents (Defendants) within the Special Proceeding, it became apparent that zero consideration was given (by SHPO or Hudson River Park Trust) as to how**

**construction within certain areas of Hudson River Park will intersect with Black, Brown and TGNC history and culture; including how these intersecting construction plans adversely impact the historic and traditional use of the park by these communities, and or how it might threaten Historic Resources associated with the same.**

35.The history of this nation, unfortunately, includes innumerable incidents where wealthy white land holders and land owners (often times the government) decides that certain land is more valuable than other land for whatever reason. Then taking steps to displace Black and Brown communities; then erasing their history and culture. This case follows that pattern and is no different.

**36.Plaintiff does not violate principles of Res Judicata by bringing this lawsuit**
While the Special Proceeding in Albany is still pending at the time of this filing, Plaintiff (Petitioner) avoids violating well established principles of res judicata since there has been zero finding of fact within said Special Proceeding, nor has the court reached a decision merits relating to any of Petitioners (Plaintiff's) claims.

37.In addition, Plaintiff avoids violating res judicata since the cases, including their targets and relief sought, are not identical.

38.In the Special Proceeding Petitioner (Plaintiff) is suing New York State officials: In this case, she is suing the federal government and agencies as well, for failing to exercise their duties over those officials.

39.Having secured the large amount of documents and records which paint a clear picture of the actions and failures of all Defendants, only after initiating the Special Proceeding and fully discovering a timeline of events which includes failures and illegal actions by the Defendants regarding Hudson River Park as recently as 2019, Plaintiff has every right to use this plethora of damning proof to seek relief and enforcement of the National Historic Preservation Act in Federal Court.

40.Congress intended the Federal government, via the United States Department Of the Interior and the National Park Service to be the ultimate custodian and keeper of Historic Resources, not SHPO's.

41.Certainly Transgender civil rights pioneers Marsha P Johnson and Sylvia Rivera are national Historic Resources (more specifically the history, places/locations and other ephemera associated with them). The same is true for "Ballroom" and other Black Brown TLGBQ+ history and culture associated with The Piers. These Historic Resources are what this case is about.

**42.The United States Department of the Interior, National Park Service: failures to list and protect all Historic Resources as per the National Historic Preservation Act, especially those relating to Black, Latino and TGNC American History**

43.Since 2014–when then President Obama and the White House announced the NPS would conduct a study of LGBTQ+ events and history– the National Park Service has continuously failed to meet its obligation under the section 106 of the National Historic Preservation Act (among other mandates under the law): failing to identify, inventory, study and preserve historic sites within Hudson River Park, located in NYC, which meet the statutory elements of sites and historic under the auspices of the NHPA, especially sites and history related to poor and disabled members of the TLGBQ+ community (including sex workers).

44.Historic sites and resources within Hudson River Park include:

**a**. the location of the death of Marsha P Johnson (a national historic figure), known today as Gansevoort Peninsula; the location where her body was recovered from the Hudson River, both in July 1992;

**45.b**.The site where Sylvia Rivera's (a national historic figure) ashes were scattered in a massive public ceremony in 2002;

**46.c**.The location known widely (across the globe) as "The Piers' ', which is arguably the most culturally and historically significant piece of real estate for the BIPOC TLGBQ+ community, in the United States of America.

47.The Piers within Hudson River Park are the modern birthplace of the world famous Ballroom Community/Scene, including the dance phenomena known as Voguing. Voguing, as created and or perfected on The Piers, has spread as far as Russia, Ukraine, and Japan.

48.Without The Piers, the world would not have the art form known as Voguing, or have hit shows like POSE (on FX), or LEGENDARY (on HBO Max).

49.Mainstream musicians and artists which have been inspired by and/or have incorporated art and culture which stem from The Piers and/or Marsha P Johnson, Sylvia Rivera include:

50.Madonna, Ru Paul, Beyonce, Lady Gaga, Kelly Rowland, Brittany Spears, Teyanna Taylor, Sam Smith, Demi Lavato.

51.Phrases such as "Throwing shade" and "Spilling tea", have all entered the modern American as well as global English speaking lexicon, placing the history and culture which is derived from The Piers squarely within the domain of protections and mandates outlined within both the National and Historic Preservation Acts respectively. Culture, including language (or dialect) and tradition which are communication across decades; Art, music; Historic figures of national and global significance.

52.All these are associated with a relatively small section of Hudson River Park. This section of the park was an undesirable eyesore before the passage of the Hudson River Park Act in 1999 (the documentary film The Salt Mines, released in 1992, the same year NHPA was amended to include "Culture", as well as the year Marsha P Johnson died at the site, documented the lives of multiple TGNC sex workers who were homeless and who lived on or near what is now referred

to as Gansevoort Peninsula, finding shelter inside NYC Dept of Sanitation trucks parked along the water at the time.

53.Defendants Hudson River Park Trust only recently came into possession of the property several years ago.

54. This area–from Christopher Street to Gansevoort Peninsula on Manhattan's West Side–wasn't a pretty or desirable place to be for most. It was dangerous, structurally unsound, and it smelled awful most of the time. However, TGNC individuals were safer than elsewhere in the city or state. This says a lot about the history of New York, America and us as a society. This history has enormous value for socialists and historians.

55.This was a place where society's most marginalized and vulnerable groups found refuge, and also ended up influencing the entire planet.

**56.In February 2020 New York State Governor Andrew Cuomo announced that a park in Brooklyn would be named after Marsha P. Johnson.**

57.This announcement by the Governor made zero sense from a historic perspective, as Marsha P Johnson had no known connections to Brooklyn whatsoever.

58. Instead Marsha P Johnson has a well documented life and death association with Hudson River Park, in Manhattan.

59. Shortly after this announcement regarding a park to be renamed after Marsha P Johnson in Brooklyn, Plaintiff, joined by other activists and community groups, made clear her opposition.

60. Eventually this controversy forced Defendants the New York State Executive Chamber (Governor Cuomo himself), and New York State Department of Parks Recreation & Historic Preservation to make changes to plans for this park (adding more historically accurate content about the Trans-rights movement for instance).

61. As a result of the controversy and discourse sparked around Defendants plans for Marsha P Johnson State Park in Brooklyn (as well as an informal appeal of agency plans which I note key Black, Brown THNC history within Hudson River Park), Defendants NYS Executive Chamber, and the NYS Department of Parks Recreation and Historic Preservation made a commitment to Plaintiff to use state funds to renew and revive the public input process for Hudson River Park in order to finally honor Marsha P Johnson and Sylvia Rivera properly; in compliance with NHPA.

62. Plaintiff's continuing outspoken criticism of Governor Cuomo and staff working in the Executive Chamber, as it relates to the memory of Marsha P Johnson and Sylvia River, caused staff working for the Governor and in the Executive Chamber to retaliate against the Plaintiff; including but not limited to refusing to follow through placing Plaintiff at a paid position she was offered in 2019, to help her transition from SSI to the workforce (Plaintiff is disabled); defamation of character etc.

63. The resignation of New York State Governor Cuomo during the summer of 2021 provided "cover" for Defendants NYS Executive NYS Department of Parks, Recreation & Historic Preservation (those individuals who were expected to remain in their respective roles in state government even after Governor Cuomo's resignation, such as NYS Department of Parks Recreation and Historic Preservation Commissioner Erik Kullesseid) to back out of commitments to come into compliance with the NHPA, and, where the NYS Executive Chamber is concerned, failing to provide Plaintiff with the employment opportunity previously promised, as previously mentioned (Plaintiff had completed the entire hiring process at the time of the COVID-19 global pandemic, and had been assured by members of the NYS Executive Chamber that she would be placed in her job following the COVID-19-lockdown).

**64. Hudson River Park Trust, New York State Department of Parks, Recreation & Historic Preservation and Gansevoort Peninsula.**

65. From 2017 to the present Hudson River Park Trust has intentionally downplayed, threatened, destroyed, hid, and or erased valuable historic resources within Hudson River Park that are associated with Black, Brown TGNC American art, history and culture.

66. HRPT claims (falsey) that between 2017 and 2019 the agency conducted adequate and unbiased public proceedings in order to seek public comment and or criticism for new construction plans at Gansevoort Peninsula, located within Hudson River Park, supposedly to satisfy statutory requirements under state and federal historic preservation law.

67. During the period between 2017 and roughly 2019, Hudson River Park Trust intentionally excluded certain minority groups, communities, individuals and organizations (such as those who historically frequent the park, such as members of the public who are Black+Latino; 68.Transgender and Gender Non Conforming individuals; Members of the Ballroom Community/Scene; impoverished and homeless New Yorkers and visitors, as well as those with disabilities) from participating in ongoing, so-called public input sessions with regards to construction plans for Gansevoort Peninsula. This exclusion equates to race-based discrimination, at a minimum.

69. HRPT took these actions because groups such as as those mentioned above, including STARR (the Strategic Trans Alliance for Radical Reform fka Street Transvestite Action Revolutionaries) and FIERCE (Fabulous Independent Educated Radicals for Community Empowerment) have organized and protested the agency's disregard for invaluable TLGBQ+ history within the park for decades (FIERCE produced an award winning documentary called Fenced Out about this very issue in the early 2000's), as such the agency feared that these organizations and voices could derail plans for a man made beach designed to placate to wealthy (mostly white) residents.

70.Plaintiff is a founding member of FIERCE and is the volunteer Executive Director of STARR.

71. Plaintiff is also the chosen, or informally adopted daughter of Sylvia Rivera; as well as the individual responsible for the recent interest in the life and death of Marsha P Johnson, having

successfully petitioned law enforcement to re-examine the investigation into her death back in 2012.

72. Plaintiff has used this unique connection to Sylvia Rivera and Marsha P Johnson, to educate the Defendants with regards to said history: Plaintiff has had direct communication with the highest levels of all agencies named in this case except for the White House, regarding this history. There is no way the Defendants can argue the history and the public records do not support Plaintiff's claims that NPS, NYS Executive Chamber, NYS Dept of Parks Recreation & Historic Preservation, HRPT have all been informed of the unique and easily verifiable historical proofs associated with The Piers and Gansevoort Peninsula.

73. In 2014 Plaintiff was invited to and did attend an inaugural event to mark the beginning of a study of national landmarks related to LGBTQ+ American history.

74. The invitation came from the offices of the then Secretary of the U.S. Department Of the Interior Sally Jewel.

75. At the event Plaintiff made her voice heard at this event on behalf of Black and Brown TGNC individuals. Plaintiff has recently uncovered a short video which documents Plaintiff urging the all white, all cisgender panel of historians named to advise with regard to this new study, to consider "Trans women of color" as a central part of the study.

76. At this event or shortly thereafter Plaintiff became acquainted with one Ms Barbara Little of the NationalPark Service, and corresponded with her for years related to the study and importance of the NPS preserving Black, Brown TGNC history and the areas within Hudson River Park.

77. Between 2014 and 2016 Plaintiff did attend multiple public meetings hosted by the NPS with regards to this study under President Obama.

78. Plaintiff submitted and presented testimony in favor of the agency (DOI via NPS) taking further steps to study and preserve Black, Brown TGNC history within Hudson River Park.

79. Somehow Defendants DOI and NPS (under the all white, all cisgender leadership and historians) chose the Stonewall Inn. This seems to be the complete opposite of what the President seemed to outline in public statements issued at the beginning of the study.

80. In June 2016 Plaintiff wrote to President Obama after Defendants DOI and NPS seemed to ignore the President's instructions in ordering the study of LGBTQ+ historic sites: The President had placed an emphasis on history and sites which were frequently overlooked in the telling of the American struggle for TLGBQ+ equality. Plaintiff sent her letter to the White House using an age-old tactic to ensure it would be open: she sent dozens of copies of the letter in a series of rainbow envelopes, just in time for Pride Month.

81. In response to her letter to President Obama, Plaintiff did receive a polite reply letter from the White House months later, vaguely acknowledging the importance of The Piers, and encouraging her to continue working with NPS to nominate additional sites, which she did.

82.Thus far Defendants have ignored both the Plaintiff and other experts in history concerning the invaluable history associated with and located in Hudson River Park.

83. HRPT continues to mislead state and federal agencies with regards to the American History and Culture (specifically Balck, Brown and TGNC history) connected to and located within Hudson River Park; Doctoring internal documents and records so that construction can continue and a wealthy developer (or developers) can continue construction of a $75 million dollar man made beach and soccer field at Gansevoort Peninsula

84. In 2021 Hudson River Park Trust along with the New York State Department of Parks Recreation & Historic Preservation announced plans for construction of a man made beach within Hudson River Park, which are based on plans and approvals from the U.S. Army Corp of Engineers which date back to the early to mid-1990's.

85. In addition to violating the NHPA, these plans are also in violation of the USDOT Act section 4(f).

86. This construction/development of Gansevoort Peninsual was orginally outlined within the Hudson River Park Act, signed into law in 1999, decades before TGNC individuals were

afforded civil protections and protected status due to centuries of discrimination, violence and abuse.

87. The Hudson River Park Act, including the establishment of the Hudson River Park Trust (made up of well connected political appointees of the Mayor and Governor), are products of *Old Albany,* that of a bygone era. One in which it is likely that those who championed the legislation (GOP leadership in Albany and NYC) cared little for Black, Brown, TGNC history.

88. It is also likely that those in Albany in 1999 may have had interests outside of the People's business in mind when envisioning development of the waterfront: The vendor contracts and bids associated with development within and along Hudson River Park are staggering. The foreseeable kickbacks and bribes imagined or entertained by politicians in Albany in the 1990's, were probably the same.

89.These plans for a man made beach i.e. development at Gansevoort Peninsula, have had a sporadic history and schedule. The initial Environmental Impact Statement for the project was completed in the 1990's, with the project stalled or staggered (without apparent reason) for decades until an accelerated pace was initiated by Defendants HRPT and New York State Department of Parks Recreation & Historic Preservation in approximately 2017, 2018.

90.Within the intervening decades (1990's through the present), the United States of America has undergone a radical transition..in terms of how Transgender Americans are viewed, treated and

protected by the Court, law, society and in the media. The same is true for Black and Brown Americans.

91.The plans for construction for Gansevoort Peninsula announced by HRPT are inconsistent with the intent behind NHPA, since it is widely accepted today that individuals and groups associated with this area of Hudson River Park are some of the most influential in American History, bar none. NHPA is designed to advance the study, preservation and consideration of more than just "ancient" burial sites, historic facades and unique architecture: certainly the location believed to be the location where the most impactful Black Transgender individuals in American history, qualifies for preservation under the NHPA.

92. Since 2021, the NPS has abandoned its responsibilities under NHPA, to assess, protect and preserve all historic resources of national import, specifically those located within Hudson River Park, especially relating to Gansevoort Peninsula.

93. Instead, the NPS has chosen to limit the scope of its work and preservation to sites like Stonewall, which does not capture the true history of Black, Brown and TGNC Americans and their struggle for civil rights in New York and across America.

94.Plaintiff will Suffer Irreparable Harm if a TRO is not Granted
Plaintiff, having lost her biological mother at age eight, and then losing Sylvia Rivera, her adopted or "chosen" mother at a relatively young age as well, is desperate to force the

Defendants to engage in good faith due diligence concerning the vital history related to Sylvia Rivera, Marsha P Johnson and Gansevoort Peninsula.

95.Without relief she will face and experience a second loss of sorts with regards to Sylvia Rivera, who along with Marsha P Johnson referred to the Hudson River as the River Jordan. This location–Gansevoort Peninsula–was once the chosen home of Plaintiff's mother. Plaintiff will be burdened with psychic pain and a sense of personal loss, including part of her own identity, which may never be restored.

96.For Plaintiff, a former ward of the state and foster youth who worked on the film Fenced Out in the late 1990's, a part of her personal sense of identity, as well as heritage and Pride. For Transgender teens (as Plaintiff once was) there is a love which a Trans-mother can provide.

97.Sylvia Rivera saved my life..from the streets and from suicide as a teen.

98.Sylvia Rivera, and the Historic Resources at the core of this case, saved the Plaintiff'slife (from the streets, and from teen suicide), and she, or "Ma" as she preferred to be called,  the potential to save far more, if her legacy and history are protected preserved.

99.Plaintiff and countless others who may wish to enter into the fields of sociology, or anthropology, in order to study this unique part of New York and American history, will be unable to do so.

100.Thousands if not millions of people share a history and culture which is being threatened by the actions and failures of the Defendants.

101.WHEREFOR the Plaintiff DEMANDS to following Injunctive Relief, as well Punitive and Compensatory Damages:

102.**Relief**

**103. Plaintiff is Seeking a TRO against the Defendants Hudson River Park Trust, and the New York State Department of Parks Recreation and Historic Preservation.**

104.Plaintiff asks this court to issue a Temporary Restraining Order against the Defendants, barring continued construction within Hudson River Park between Christopher Street and Gansevoort Peninsula until this court can hear parties on the merits.

105.**Injunctive Relief**

106.**Plaintiff asks this court to grant Injunctive Relief in this case. Plaintiff requests an an Order: Directing the Defendants to conduct an internal review related to;**

   I.    the location of the death of Marsha P. Johnson; where her body was recovered in 1992.
   II.   The location where the ashes of Sylvia Rivera were scattered within Hudson River Park in 2002

III.   All historical information related to the Ballroom Scene, the longest running art collective of TLGBQ+ artists in United States history, and its relation, if any, to Hudson River Park;

IV.   Defendants will study whether modern Ballroom Scene, including its fraternal cohorts known as "Houses" can indeed trace their origins back to two individuals (siblings) formerly enslaved, named William Dorsey and Daniel Swann;

V.   Defendants are directed to provide Plaintiff, the court and the public, a written determination and explanation, ***rooted in the historic facts and scientific expertise at the disposal of the Defendants***, as to why the aforementioned historical figures, their cultural descendants, and the structures known as The Piers and Gansevoort Peninsula, ***do not qualify*** as Historic Resources under both the National Historic Preservation Act, ***by July 6th, the anniversary of the date Marsha P Johnson's body was recovered from the Hudson River in 1992).***

## 107.Punitive and Compensatory Damages

Plaintiff is also seeking unspecified Punitive and Compensetory damages from Defendants Hudson River Park Trust, the New York State Executive Chamber, and the New York State Department of Parks Recreation & Historic Preservation, discrimination on the basis of:

Race, Sex, Gender Expression, Disability; Retaliation, Defamation of character, Employment Discrimination violation of:

108. ***The United State's Constitution; First, Fourth, and Fourteenth Amendments (among others)***;

109.*The Constitution of the State of New York; Article I, Sections (6)(8) and (11)*, among others;

110.*Title VII of the Civil Rights Act of 1964*

111.*Title I and II of the Americans with Disabilities Act of 1990*

112.*Human Rights Laws of both the City and State of New York respectively.*

113.*In addition to State and Federal laws prohibiting Defamation, Libel and Slander.*

Respectfully Submitted

MARIAH LOPEZ

Plaintiff Pro Se

June 3rd 2022

MARIAH LOPEZ

708 CONGRESS STREET

SCHENECTADY NY 12303

C.2124709687

Mariah4change@gmail.com

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK

_____

MARIAH LOPEZ                                                    **DECLARATION OF**

                                                                         **MARIAH LOPEZ**


V

U.S. DEPARTMENT OF THE INTERIOR,                   **INDEX NO._____**

NATIONAL PARK SERVICE,

HUDSON RIVER PARK TRUST INC,

NEW YORK STATE EXECUTIVE CHAMBER,

NEW YORK STATE DEPARTMENT OF PARKS

RECREATION & HISTORIC PRESERVATION

_____

UNITED STATES DISTRICT COURT;

SOUTHERN DISTRICT OF NEW YORK


## Declaration of Mariah Lopez


This Declaration is submitted as a part of Plaintiff's civil complaint filed June 3nd

2022, which also contains request for TRO and Injunctive Relief.

The Declaration is also a timeline and guide related to Plaintiff's claims; her standing in this case, and the history of the public figures, events, eligible for study and preservation as historic resources under the NHPA which are driving this case.

In a tradition among Trangender individuals which has exitsed for over a century in this country, Sylvia Rivera, Transgender rights pioneer, activist and veteran of the historic Stonewall uprising "chose", or selected Plaintiff to be her informally adopted child. The importance of this decision by Sylvia Rivera cannot be overstated: A Transgender women chooses a duaghter to carry out many of the same social and familial roles and responsibilities that a biological child would, since many Transgender individuals opt not to have biological family (or are unable to).

Choosing or selecting a Trans-child: Son or Daughter, is not something a Transgender adult does lighly.

When Sylvia Rivera made the decision to "adopt" Plaintiff in June/July of 2002, she did so knowing that she had only months to live.

It was her intention to secure her legacy, and to pass STARR along to Plaintiff.

By roughly age 16 or 17 when Plaintiff was "adopted" by Sylvia Rivera she had already set herself apart amongst her generation of TLGBQ+ youth, as especially outspoken on behalf of Trans-rights. Plaintiff and Sylvia Rivera had this in common.

Other commonalities between Sylvia and Plaintiff, which likely lent support to her decision to "adopt" Plaintiff include the fact that both were raised by their maternal grandmothers after their mothers had passed away when they were quite young; both ran away only to find the West Village and other areas where TLGBQ+ people congregated and found safety. Both were trafficked as children.

Both Sylvia and the Plaintiff were community orientated, and both wanted to actively work to uplift the oppressed and to confront the state for its many abuses targeting minorities.

Sylvia Rivera certainly loved the Plaintiff, despite the limited time they had together. It is likely that the knowledge that Plaintiff would carry out her legacy, helped her pass away more peacefully. Many who knew Sylvia Rivera would remark on how at ease she seemed while transitioning from this life for the next. Being surrounded by young people who shared her passion provided her with a lot of joy.

In one of the final recordings made of Sylvia Rivera, she can be heard referencing her Transgender-Children, as the ones who will carry out her legacy and defend the truth against revisionist history and erasure.

Plaintiff has continued the legacy and work of Sylvia Rivera by rejuvenating the first known human and civil rights organization Trans-rights organization in the U.S. (which Ms Rivera founded along with fellow American icon and Stonewall veteran Marsha P Johnson in 1969),

called STARR  Strategic Trans Alliance for Radical Reform, formerly known as the Street Transvestite Action Revolutionaries.

Sylvia Rivera and Marsha P Johnson's stories differ from that of any other leader to emerge from the civil rights movement:

Their struggle, from the very first hours of their activism in 1969, was defined by the intersection of three key sources of oppression and inequality:

1. Their identities and circumstances as Queer youth in a space (and later a movement) created for by and for adults, Stonewall (Sylvia Rivera and Marsha P Johnson were teens in 1969);

2. Their identies as Trans' idivididuals (the word Transgender did not even exist at the time the Stonewall uprising), which cisgender Gays and Lesbians held against them and finally;

3. Devastating poverty. Poverty forced them to work the street (to sell their bodies) almost every single night in order to make enough money to survive.

**Sylvia Rivera and Marsha P Johnson's poverty, including their need to engage in survival sex work (which in turn subjected them to futher abuse while in contact with the criminal justice system of the late 1960's and early 1970's..truly hellish) is a unique defining featuring in terms of these women's legacies among other notable civil rights figures. They had everything stacked against them.**

This poverty, including homelessness would become something of a hallmark of STARR's work for more than half a century. Those who are homeless and impoverished, fighting "the system".

The poverty experienced by Sylvia and Marsha, meant that they spent a significant amount of their lives living within what is now called Hudson River Park, homeless.

It is hard to find any other human and civil rights leaders to emerge from the turbulence of the 1960's and 70's (from Dr MLK, Angela Davis, to any of those present at Stonewall during the riots, such as Jim Fourat) of which poverty is so integral to their historic legacy and contributions.

STARR stood apart from other groups of the era because its message was radical, and intersectional: Trans rights (which didn't even exist conceptually before Stonewall) are human rights. Also, STARR wanted leaders of these groups and movements to focus on addressing poverty and racism, right along with police brutality and criminal justice reform.

These "intersectional" values were almost unheard of at the time.

STARR wanted to merge multiple movements. "Street" folk (Queer runaways). "Gay folk" (white cis Gays and Lesbians). "Civil rights folk" (both arms of the movement, from non violent to the Panthers). And so on and so forth.

For the most part people of different civil and human rights movements of the 1960's and 1970's remained in their respective corners. Different factions were not united as one intersectional movement.

But Sylvia Rivera, Marsha P Johnson and the many other teens and young people who formed a micro community within the wider "Gay" community, lacked priviledge. They could not shirk the other aspects of their identities, such as being of African American and Puerto Rican descent, or being poor and homeless.

**And they could not avoid being subject to abuses which Gay men and Lesbian women would never face, such as criminal laws in New York designed to target Transgender people; these did not apply to cigender Gays and Lesbians (who could "pass).**

Both women were also raised in religious households under strong women of color. This meant, of course you feed the poor, house the homeless and fight state oppression of minority groups..duh.

The first ever Transgender human and civil rights organization in the U.S., STARR immediately worked within a framework and philosophy of what we would call mutual aid and harm reduction:

STARR secured a building to use as a shelter and headquarters on the Lower East Side in the early 1970's.

Adult Trans' individuals and members would go out at night to "hustle" the streets for money to survive day to day, while younger and or infirm or disabled individuals remained safe indoors. All members were expected to be politically active.

During this period, STARR was rejected by the mainstream white, cisgender Gar Rights (or Homophile) movement, and found fellowship and common values with the Black Panther Party and the Young Lords. The Young Lords actually created and gifted STARR's first parade banner in the early 1970's.

Eventually, poverty and many "isms" forced Sylvia Rivera and Marsha P Johnson entirely out of the very movement they helped created (the growing flame for "Queer" liberation).

Sylvia Rivera and Marsha P Johnson (along with other STARR members) were often verbally abused and subject to physical threats as they attempted to exercise free speech at events organized by white cisgender Gays and Lesbians in the years following Stonewall.

This abuse forced them to retreat, literally and figuratively, to the margins of society (once more) and to the area now known as Hudson River Park.

For over two decades and until both of their deaths, a small area within Hudson River Park became the most important place on the planet to these women.

**A Century Before Stonewall. The importance of William and Danielle Swann on American History and Culture**

**According to author Channing Joseph:**

"Born in Maryland in 1860, Swann endured slavery, the Civil War, racism, police surveillance, torture behind bars, and many other injustices. But beginning in the 1880s, he not only became the first American activist to lead a queer resistance group, he also became, in the same decade, the first known person to dub himself a "queen of drag"—or, more familiarly, a drag queen.

In 1896, after being convicted and sentenced to ten months in jail, on the false charge of "keeping a disorderly house"—a euphemism for running a brothel—Swann demanded (and was denied) a pardon from President Grover Cleveland for holding a drag ball. This, too, was a historic act: **it made Swann the earliest recorded American to take specific legal and political steps to defend the queer community's right to gather without the threat of criminalization, suppression, or police violence.**

When I tell people that I'm writing a book about the life of a former slave who reigned over a secret world of drag balls in Washington, DC, in the 1880s, the looks of shock, delight, and even confusion on their faces tell me all I need to know.

My research on Swann began 15 years ago, when I stumbled upon a *Washington Post* article from April 13, 1888. The headline leaped off the page: "Negro Dive Raided. Thirteen Black Men Dressed as Women Surprised at Supper and Arrested." According to another news account, more than a dozen escaped as the officers barged in and Swann tried to stop them, boldly telling the police lieutenant in charge, "You is no gentleman." In the ensuing brawl, the Queen's "gorgeous

dress of cream-colored satin" was torn to shreds. (The fight was also one of the first known instances of violent resistance in the name of LGBTQ rights.)

To nineteenth-century observers, Swann's dance party was a shocking and immoral fiasco perpetrated by a vanishingly tiny minority of "freaks." The *National Republican*, another Washington daily, said of the men arrested in the raid, "It is safe to assert that the number living as do those who were taken into custody last night must be exceedingly small." Yet, despite their minuscule numbers, they made quite an impression: hundreds of onlookers followed the men to the station to steal a glimpse of silk and skin.

To nineteenth-century observers, Swann's dance party was a shocking and immoral fiasco perpetrated by a vanishingly tiny minority of "freaks."

That spring night in 1888 wasn't the first time the DC police had broken up one of Swann's dances (nor would it be the last). A similar raid occurred on the night of January 14, 1887. The *Washington Critic* dutifully reported, "Six colored men, dressed in elegant female attire, were arraigned in the dock at the Police Court this morning on a charge of being suspicious persons. [. . .] They nearly all had on low neck and short sleeve silk dresses, several of them with trains," as well as "corsets, bustles, long hose and slippers, and everything that goes to make a female's dress complete."

Drag balls had been going on in secret for years. Invitations to the dances, for instance, were often whispered to young men at the YMCA, and newspapers described the arrests of several Black men wearing "bewitching" fascinators, silk sacques, or cashmere dresses while en route to

balls. In 1882, Swann served a jail term for stealing plates, silverware, and other party supplies. But the 1887 raid was the first time the wider world learned of him and the motley group of messengers, butlers, coachmen, and cooks.

Swann's drag balls came with grave risks to his guests' reputations and livelihoods. A large but undetermined number managed to flee during the police raids, but the names of those arrested and jailed were printed in the papers, where the men became targets of public scorn. With the news coverage, the world took an interest—everyone from neighbors and police to local officials and even psychiatrists. Now that the group was publicly known, it would prove to be a fascinating new subject for researchers trying to grapple with the complexities of human sexuality and psychology. Lacking any of the terms we use today, like "cross-dresser," "transgender," and "gender-nonconforming," Dr. Charles Hamilton Hughes described Swann's group in an 1893 medical journal as an "organization of colored erotopaths" and a "lecherous gang of sexual perverts." Another psychiatrist, Dr. Irving C. Rosse, described them as "a band of negro men with . . . androgynous characteristics."

On the one hand, the publicity made it more difficult for Swann and his friends to stay hidden from those who sought to do them harm. On the other hand, now that their existence was widely known, more people might have been interested in joining his secretive all-male family.

Swann's gatherings continued, featuring folk songs and dances, including the wildly popular cakewalk (so named because the best dancer was awarded a hoecake or other confection). Many guests dressed in women's clothes, though some wore men's suits. Harlem's famous Hamilton Lodge masquerade balls, which began in 1883, were traditional masked dances and would not be

"taken over by the gentry from fairyland," as one *Baltimore Afro-American* reporter colorfully put it, until 1925 at the very earliest.

The actions of Swann and his followers were particularly significant in light of nineteenth-century attitudes toward masculinity. At the start of the Civil War, President Abraham Lincoln, glossing Henry Wadsworth Longfellow, urged an apprehensive nation to "go forward without fear, and with *manly hearts*" (emphasis added) to fight a war that would eventually lead to full citizenship for all Black men. In 1879, the *Evening Star* reported that the abolitionist Frederick Douglass advised that "with a full complement of *manly qualities* the negro could and would make himself respected in every part of the republic." In post-Civil War America, there was very little patience for men who subverted gender norms.

The actions of Swann and his followers were particularly significant in light of nineteenth-century attitudes toward masculinity.

On April 16, 1862, President Lincoln signed the Compensated Emancipation Act, freeing all slaves in the District of Columbia. In the years after that, Washington came to be seen by newly liberated African Americans as a place of freedom and economic opportunity. Swann and many others in attendance at his balls were born in bondage, and many probably expected to live out their lives that way. Some of his friends vividly remembered growing up and coming of age in the antebellum years, when they were subject to their masters' whips and whims. Finding love and joy in community with one another was essential to their survival.

Swann was the property of a white woman named Ann Murray and was living on her plantation in Hancock, Washington County, Maryland, when Union soldiers marched through in the winter of 1862. His intimate friend Pierce Lafayette—whose elegantly furnished two-story home was the site of the 1887 party—had been born enslaved in Georgia. Lafayette had been owned by Alexander H. Stephens, the vice president of the Confederate States of America. (It's interesting to note that Lafayette's prior relationship with Felix Hall, a male slave dubbed Lafayette's "negro Mistress," is the earliest documented same-sex romance between two enslaved men in the United States.) Also, two of Swann's younger brothers attended his balls dressed in women's clothing, demonstrating that the group truly was an extension of his family.

In 1900 and beyond, after William Swann's retirement from the drag scene, his little brother Daniel J. Swann continued the family tradition in Washington. He provided costumes for the drag community there for roughly five decades, until his death, in 1954—through the rise and fall of notable Black DC drag queens like Alden Garrison and "Mother" Louis Diggs. (By the early twentieth century, newspapers in the Baltimore and Washington area had documented the use of family terms to denote rank within groups of ball participants, with "mother" reserved for an older person serving as a mentor to younger ones. The term "queen," though used loosely today, was until the 1960s often reserved for someone in a position of honor and leadership in the community.)

In 1900 and beyond, after William Swann's retirement from the drag scene, his little brother Daniel J. Swann continued the family tradition in Washington.

Today, more than a century after William Swann's last known ball, the houses of the
contemporary ballroom scene maintain the same basic format as the House of Swann's. The balls
feature competitive walking dances with exaggerated pantomime gestures, and they are
organized around family-like groups led by "mothers" and "queens." Strikingly, descriptions of
balls from the 1930s are sprinkled with phrases like "strike a pose," "sashay across the floor,"
and "vogue." Such expressions, now part of mainstream popular culture, are regularly heard on
FX's *Pose* and VH1's *RuPaul's Drag Race*.

Though the Stonewall uprising of 1969 is often touted as the beginning of the fight for gay
liberation, Swann's courageous example forces us to rethink the history of the movement: when
it began, where it came from, and who its leaders were. Coming of age at a time when an entirely
new form of freedom and self-determination was developing for African Americans, Swann and
his house of butlers, coachmen, and cooks—the first Americans to regularly hold cross-dressing
balls and the first to fight for the right to do so—arguably laid the foundations of contemporary
queer celebration and protest. □"

By the 1920's and 30's in NYC several key factors would contribute to the further incubation and
development of the Ballroom and Drag cultures we know and enjoy today: African American
"strongholds" of community and culture, especially music which helped tie these community
back to their Afro-Caribbean roots–began to take root in places like San Juan Hill and Harlem.

Also, the influx of citizens arriving from the Island of Puerto Rican, would contribute greatly to
the overall mixing of culture within NYC's poor and immigrant communities of color, leading to
the foundation of the music which would serve as the glue for the Ballroom Scene some five
decades later, such as disco and Afro House. These places, San Juan Hill and later Harlem would

also provide a home base of sorts for many early members of Ballroom, hosting hundreds if not thousands of Balls within the halls and gathering spaces of old Harlem.

Still, Black and Laatino Gay and Transgender individuals were not free to be out during the height of Black, Latino entertainment and culture throughout NYC's, from the 1920's and beyond. The West Village (ironically most likely to once being referred to as "Little Africa" for the area's unique free African American population in the late 1700's and through the 1800's). The West Village, even in the early to mid 20th century, was known for its diversity and free spirit.

In the 1950's and 60's modern Ballroom–rooted in the cultural traditions started by the Swann brothers a century before–was starting to form. By the 1970's and into the 1980's, when AIDS and crack descimated Ballroom, both the Transgender community as well as the Ballroom Community were enjoying The Piers, as being Gay or Trans' was still illegal (criminally). The safest place to be was by the water.

Black and Latino, Gay and Trangenser individuals would use NYC's vast subway system to travel from the Grand Concourse, and from Jamaica Estates; From Fort Greene and Coney Island, to the Village..and then to the Piers.

The geography allows a sort of grand march from most subway hubs near West 4th Street and bSheridan Square, due West straight across Christopher Street, where one is bound to be stopped no less than ten times before reaching The Piers, to greet and hug friends and acquaintances.

The route served as the end of the annual Pride Parade for years because of its universal location.

The Piers served as a landmark for generations of members of the Transgender and Ballroom community, decades before cell phones, having a static, reliable location to meet up with and plan social events at, was critical for these communities.

Also, in a country where "land" is at a premium, it quickly became clear to members of these communities that The Piers were their unofficial "home".

**The Impact of "Juneteenth" on this Case And Controversy**

On June 17th 2021 President Biden signed into law making Juneteenth the 12 Federal Holiday. This was of course in the wake of the global uprising against racism and state violence against the descendents of enslaved Americans. William Dorsey Swann, and Ballroom, and the thousands of members of this community world wide and the literal millions of the people who consume Ballroom culture annually, deserve to be honored and discussed alongside dates and History, such as Juneteenth.

It is truly remarkable people, such as Ballroom and Transgender community, with no blood ties, were able to maintain, preserve and adapt art, in a world which is trying to destroy them at every turn.

**How Black, Brown Communities are Recovering our Identities**

Since the protests and outrage we all experienced in 2020 and 2021, society has been more willing to engage in candid conversations about the residual and persistent remnants of chattel slavery, including the loss of cultural and familial identities of millions of people alive today, descendants of those stolen from Africa.

Plaintiff has recently utilized a popular product to trace her DNA. Plaintiff's family, on both sides, is extremely limited in the information available to them with regards to ancestry, However, DNA results show more than one third of her genetic ancestry was inherited from African and or Indigenous peoples.

Plaintiff submits this information for two main reasons as it relates to fighting for historic preservation within Hudson River Park.

First, the idea that Plaintiff is related to formerly enslaved Americans, and those brought originally from the continent of Africa, is not abstract, and so she understands every single day the pain of lost heritage and history. Plaintiff has been robbed of her ancestral ancestry and or meaningful relationship through the same as it relates to the continent of Africa.

The same is true for tens of thousands of members of Ballroom and the Transgender Community. Where family exists for these individuals, even under the best of circumstances, the historic record stops: goes blank, only a few short generations back.

The second reason Plaintiff mentions her ancestral DNA is lay out a case for why she is entitled to assert that there is a correlation between its creation and the institution of slavery.

Part of the resilience of Black and Brown individuals and communities in this nation, in coping with the sins of our past, has been to create a life anew, from Soul Food, Voodoo, Santeria; Jazz, Hip Hop, Fashion.. The Cakewalk and other pageantry.

This was "expression", as much as it was a great and noble people, starting over, from scratch! People will, as both early cave art as well as fine art hangin in museums prove, make art.

THis art always tells a story. And, it is all worth preserving. Along with all "history".

This history, unique in the Americas, which is now anchored within Hudson River Park, created by the descendants of people stolen from Africa, must be preserved at all costs.

**Relevant Timeline Concerning Hudson River Park, it's History and History of Central Figures in this Case:**

**In 1990** Madonna's hit song "Vogue" was released. The Piers helped provide a space for Black, Brown TLGBQ+ artists and community members to rehearse and express this unique craft.

**1990** Paris Is Burning, was released.

**1992** New York City and State enter into an agreement which would lead to the development of the "Hudson River Park Conservancy", predecessor to "HRPT".

**1992** "HRPC" excludes and omits historical facts with regards to minority groups which utilize the waterfront at Christopher Street, or The Piers when communicating with the Federal government U.S. Army Corp of Engineers. these facts should have led to further input from both the US Army Corp of Engineers, the NPS, and well as Black, Brown and Transgender community.

**1992 July 5th** Marsha P Johnson enters the Hudson River at Gansevoort Peninsula in the early morning hours of July 5th; Her body was sighted and removed from the water just south of Gansevoort Peninsula, at Christopher Street on July 6th.

**1992** the documentary film The Salt Mines is released in NYC, documenting the lives of Transgender sex workers who were living at/in what is now Hudson River Park, specifically Gansevoort Peninsula.

**1993** Plaintiff's mother dies in NYC of complications related to HIV/AIDS, leading her to enter into NYC foster care shortly after. Destined to meet Sylvia Rivera.

During this period, Sylvia Rivera, devastated and reeling from the death of her best friend, and watching as AIDS and the crack epidemic ravaged her community, retreated: she lived outdoors at The Piers (and at the location where The Salt Mines would later be filmed), known today as Gansevoort Peninsula within what is today Hudson River Park. At the time it was a shanty town, where the homeless and hungry existed, and died, out of sight. Sylvia Rivera would be recorded in a historic interview while staying at Gansevoort Peninsula (referred to in the recording as The Piers for lack of any other term for the entire waterfront).

Two women, a couple, named Rusty Mae Moore and Chelsea Goodwin would provide Sylvia Rivera a place to stay in Brooklyn New York, starting in approximately 1995.

**1998 June 2nd** Plaintiff is 13 and runs away from an abusive placement within NYC foster care, discovering The Piers and the West Village for the first time. Plaintiff meets Jennie Casciano Blakney, and Alexia Lewnes who serve as mother figures.

**1999** NYS passes Hudson River Park Act. Sylvia Rivera emerges from semi-retirement to defend The Piers against gentrification and historic erasure; the foundations of FIERCE are layed.

**2000 June 20th** Amanda Milan, a Transgender woman of color is murdered in broad daylight in NYC, sparking Sylvia Rivera, Rusty Mae Moore and Chelsea Goodwin to organize New York's first Transgender Day Of Action, as Amanda's death occured just one week before NYC Pride. Today the last Friday of June is referred to as the Trans Day Of Action.

**2000** *Fenced-Out* documentary film created by the youth of FIERCE to fight against erasure and displacement of history, Queer youth and other minority groups visiting The Piers, was finalized.

**2000 April** Plaintiff is arrested for Loitering with the intent to engage is Prositution in the West Village; age 14.

**2000 June** Plaintiff is sentenced to one year in the custody of NYS-OCFS for the arrest that occured in the West Village. However, already "out" of the closet, and identifying as Transgender, Plaintiff's law guardian and adults like Jennie Casciano and Alexia Lewnes scrambled to petition Family Court to order NYS-OCFS to take steps to protect her rights as a Transgender child, which the court granted. Still, Plaintiff faced serious abuse due to her Transgender identity while in the custody of NYS-OCFS.

**Starting in approximately July 2000 Plaintiff was housed in an all male, boot-camp style facility in ultra concervative Cattaraugus County, Limestone NY. She was abused almost every single day while residing at said facility. Eventually a Family Court judge ordered Plaintiff released on April 23rd 2001, due to the persistent abuse she was facing.**

**2001 May** the government (NYC Corporation Counsel) seeks to revoke Plaintiff's release from OCFS, and to return her to confinement. Again the adults in Plaintiff's life scramble to find an alternative placement for her, outside of NYS-OCFS.

**2001 June/July Jennie Casciano Blakney introduces Plaintiff to Rusty Mae Moore, Chelsea Goodwin and Sylvia Rivera, presents them as a resource to her Law Guardian Louis Sartori esq (to present to the court as an alternative to incarceration).**

**2001 June/July Sylvia Rivera "adopts" Plaintiff as her Trans-child: directs her to never call her "Sylvia" again. States to Plaintiff in front of Rusty Mae Moore and Chelsea Goodwin in the front parlor of what was then referred to as Transy House (a new "STARR" location and headquarters), "I'm your mother now. Call me Ma". Within modern American TLGBQ+ culture and tradition, when Plaintiff accepted, an almost unbreakable familial bond was formed between Sylvia Rivera and the Plaintiff.**

**2002 February 19th** Sylvia Rivera dies in NYC at Saint Vincent's Hospital. Her ashes would later be scattered at both Stonewall (by Plaintiff) as well as at the location within Hudson River Park where Marsha P Johnson's body had been recovered from the water in 1992. This was done as a part of a large public memorial service; the scattering of Sylvia Rivera's remains within Hudson River Park (on purpose) is well documented.

**2002** Plaintiff wins the landmark case for Trans rights Jean Doe v Bell (against the NYC ACS Commissioner)

During this period (circa 2002-2005), FIERCE was quite active in the West Village and with regard to The Piers, heavily promoting *Fenced-Out,* and engaged in constant community organizing to combat NYPD misconduct, including an increasing number of young people being displaced from The Piers.

**2007** Plaintiff wins the landmark case for Trans rights (healthcare), Lopez v Mattingly: forcing both NYC ACS and eventually, NYS Medicaid, to fund gender affirming care for those who need it.

**2010-12** SHPO is consulted by the U.S. Army Corp of Engineers with regard to a pipeline which intersects with Hudson River Park, Gansevoort Peninsula failed to identify important Black, Brown, TGNC history within the park as historic resources under section 106, NHPA, before giving the project the green light move forward. *Plaintiff only became aware of this information as part of a Special Proceeding in Albany Supreme Court, in February 2022, Lopez v Hochul et al 781-22.*

**2011/12** Plaintiff along with other members of the Trans community re-launch STARRas per Sylvia Rivera's wishes, with an updated name and mission.

**2012 November** STARR launched a campaign called Paint The Town Red for Our Dead, an initiative to build community support for establishing permanent memorials to Sylvia Rivera, Marsha P Johnson and the Ballroom Community respectively.

**2012 November** Transgender Day Of Rememberence. Plaintiff convinces Senior Assistant District Attorney, Deputy Bureau Chief of Trial Bureau 50 Warren Murray, to re-examine the death of Marsha P Johnson

**2014** President Obama announces a "study" of national LGBTQ+ history and landmarks, via the U.S. Department Of the Interior, and the National Park Service.

**2014** Plaintiff is invited by staff working in the U.S. DOI to attend a public event to kick off said "study". Plaintiff attends the event (held in Washington D.C.) and publicly urges a panel of experts appointed under the President's initiative (all white, all cisgender), to include the history of Trans women of color, as a focal point of the study.

**2014** Plaintiff establishes further contact with staff working on this "study", including Ms Barbara Little of the National Park Service.

**Plaintiff views this period (circa 2014-2016) and her extensive communication with the White House, U.S. DOI and NPS (via their agents and official modes of communication) as the first point (to her knowledge) when section 106 of the NPHA, including all related**

**regulations, duties and responsibilities with regards to Black, Brown TGNC history and historic resources within Hudson River Park.**

**2015** Plaintiff is contacted by Oscar nominated Director and journalist David France, who is in the beginning stages of creating the film The Death and Life of Marsha P Johnson, based on the re-examination of the case. Mr France and Plaintiff enter into an agreement to work together on the film. Plaintiff would eventually back out of the project.

**2015** Plaintiff receives a call from ADA's Warren Murray, Eugene Hurley, Joan Illuzio, joined by LGBT Community Liaison Katie Doran, all of the NY County DA's office, who called to inform Plaintiff stating that the office had concluded that determining who caused the death Marsha P Johnson was essentially impossible.

During this call Plaintiff expressed her displeasure with this decision yet urged the group to now move on to other "cold cases" involving the homicides of well known Transgender New Yorkers, such as Ali Forney, Venus Xtravaganza, among others. ADA Murray did in fact begin the process of locating files for these individuals, the first step in re-examining any "cold case".

**2015 -2016** Plaintiff and other members of the TLGBQ+ community organize the annual Trans Day Of Action within Hudson River Park to raise awareness of the history of the park and to continue the work (STARR) started, years before, to honor those TGNC who came before it and who have associations with the area and park. Reverend Al Sharpton assisted the Trans community in securing The Piers for TDOA in 2015.

**2016 U.S. The Department Of the Interior, National Park Service and the White House releases the findings of the so-called LGBT+ Historic Landmark "study" under USDOI, NPS, and The Piers are not listed.**

**2016 June Plaintiff writes to President Obama at White House, sending a large number of rainbow envelopes containing copies of her letter, in order to ensure that the envelopes would be open, and hopefully increasing the chances that the government would respond. Plaintiff learned this trick from members of ACT UP, which would send large numbers of neon envelopes containing copies of their letters to government officials regarding the AIDS epidemic.**

**2016** Plaintiff receives a slightly more-than-generic response from "President Obama " with a return address of The White House. The letter thanked her for her advocacy and encouraged her to continue to work with the U.S. D.O.I. and NPS to identify and nominate further sites, history and landmarks for designation under the NHPA.

Plaintiff has since lost copies of this letter from the White House from "President Obama" but is sure that the correspondence would have been preserved as per White House policy, as well as the Presidential Records Act; only a select number of letters addressed to the President receive a written reply (even if from the President per se). Meaning, the White House most likely preserved said correspondence, along with several hundred or perhaps thousands of other letters which White House staff chose to respond to that "Pride" 2016.

**2017** Plaintiff files the landmark case Lopez v NYC DHS (17-cv-3014 SDNY), pro se, regarding a shelter with rampant abuse of its resident, named after Marsha P Johnson.

**2018** Hudson River Park Trust once again receives a written assessment from SHPO, stating that their construction at Gansevoort Peninsula could proceed without threatening or destroying any historic resources under section 106 of the NHPA.

**2018 Plaintiff is contacted by the New York State Executive Chamber due to her status as head of STARR and as Sylvia Rivera's adopted daughter, and she is invited to apply for a state fellowship named in her honor.**

**2019** January. Governor Cuomo signs GENDA into law.

**2019 May-June** members of the New York State Executive Chamber essentially "forced" Hudson River Park to ensure that The Piers are open for World Pride. Governor Cuomo issues a lengthy statement citing the "history" of The Piers as his reasoning.

**2020 February** Governor Cuomo announces the renaming of a NYS Park (the first in the nation) after Marsha P Johnson, a Black Trangender woman who lived on The Piers and died there too, This park however, is located far from any known location associated with Ms Johnson.

**2020** June, Pride Sunday Hudson River Park and the New York State Department of Parks Recreation and Historic Preservation retaliate against Plaintiff for the dressing down they received over The Piers the previous year via the NYS Executive Chamber; HRPT and the New York State Department of Parks Recreation & Historic Preservation attempted to shut down The Pier on Pride Sunday 2020. This is despite the Governor's clear messaging, not only about COVID safety and utilizing NYS Parks (since outdoors spaces are so much safer than indoors), as well as the order to keep The Piers open (to mostly Black and Brown park visitors) on Pride which was issued the previous year.

**2020 June** Pride Sunday Plaintiff and other community members protested (on the spot) and forced HRPT and NYS PRHC to remove barricades which had been installed overnight, restricting access to The Piers (which are open literally every other day of the year).

**2020 August 24th** Members of the New York State Executive Chamber, and New York State Department of Parks Recreation and Historic Preservation did essentially "blacklist" Plaintiff and other members of STARR with regards to a public event to reveal plans for Marsha P Johnson State Park in Brooklyn. These actions were taken by members of the NYS Executive Chamber (including Matthew McMorrow and Deputy Secretary Jesse Campo-Amor) as a means of retaliating against Plaintiff for her constant criticism of both agencies as well as to prevent her from doing the same during or at the event. There were reportedly no Transgender women of color at the event.

**2021 January** Hudson River Park Trust construction of a man made beach at Gansevoort Peninsula; causing Plaintiff and others, such as current Executive Director of FIERCE Mustafa Sullivan to voice their opposition to the plans, and their outcry with regards to a lack of minority inclusion in any public process concerning plans for the area and location (for obvious reasons). 2021 February. Plaintiff convinces the Lieutenant Governor Kathy Hochul to honor Sylvia Rivera on the anniversary of her death with a Tweet: The Tweet contained a photo of Sylvia Rivera sitting just under Gansevoort Peninsula

**2021 March** Plaintiff and other members of the public attend a virtual Community Board meeting in which New York Governor Cuomo, Commissioner for NYS Dept Parks Recreation Historic Preservation Erik Kulleseid, among other state officials planned on finalizing plans for Marsha P Johnson State Park in Brooklyn: Plaintiff expressed outrage over the plans. Construction is halted the very next morning, so that the state can go back to the drawing board.

**2021 April** Plaintiff is hired by the NYS Dept of Parks Recreations and Historic Preservation via a firm called MOEY Inc, to assist the agency in reviewing and approving historical content within Marsha P. Johnson State Park in Brooklyn.

**2021** After Plaintiff initiates an appeal of plans for Gansevoort Peninsula, Commissioner Erik Kullesseid agrees to (comply with section 106 of the NHPA), and states he will order new renderings and seek additional public input for construction at Gansevoort Peninsula

**2021** June Plaintiff organizes what is becoming the new-normal; an annual tradition, celebrating
Pride Sunday at The Piers within Hudson River Park. The NYS ESD even promoted the event
for a month on the official state sponsored site and platforms for tourists visiting New York. Still,
members of the NYS Executive Chamber, and Hudson River Park Trust retaliated against
Plaintiff by weaponizing public restrooms, water fountains and police against crowds

**2021 July Plaintiff files a civil case 1:21 cv 05721 (Lopez v Hudson River Park Trust et al)
in SDNY with regards to the retaliation in June 2021, but the case is later dismissed
without prejudice.**

**2021** July Members of the New York State Executive Chamber invite Plaintiff to a meeting to
discuss a resolution to what occurred during Pride; and how Plaintiff and the state might be able
to move forward.

**2021** July New York State Governor Cuomo announces his resignation, effective August 24th. .

**2021 August 24th (ironically on what would have been Marsha P Johnson's 75th birthday)
NYS Governor Kathy Hochul is sworn in. Plaintiff immediately urges the Governor to
issue a Tweet to mark Marsha P Johnson's birthday, which the Governor does.**

**2022** January Plaintiff learned that New York State Department of Parks Recreation & Historic
Preservation, along with Hudson River Park Trust, were not taking steps to implement the
changes agreed to as a result of Plaintiff's previous appeal, and so she sent a letter to said

agencies demanding that construction at Gansevoort Peninsula–which threatens to destroy decades of TGNC history–cease, and threatening litigation in state court if it did not.

**2022** January 28th Plaintiff receives a response from General Counsel for Hudson River Park Trust doubling down on the agency's plans to continue construction at Gansevoort Peninsula.

**2022 February 2nd Plaintiff reiterates her intent to challenge this decision (that there is no history to preserve at the site as defined by section 106 of the NHPA), and her intent to sue; initiating multiple calls and emails to NYS Executive Chamber, New York State Department of Parks Recreation & Historic Preservation, and Hudson River Park Trust, as a means of trying to avoid litigation, and to inform them that she already had a lawsuit drafted and would be heading to court if parties could resolve key issues.**

**2022 February 3rd Plaintiff (Petitioner) filed an article 78 Proceeding, titled Lopez v Hochul (781-22) in Albany Supreme Court, seeking declaratory relief aimed at preserving key history associated with The Piers and Gansevoort Peninsula, as well as a TRO preventing construction at Gansevoort Peninsula for the reasons outline already, which the court granted. The case was scheduled to be assigned to a judge on February 25th 2022. Counsel from the NYS AG's office who was representing Respondents immediately requested Petitioner consent for a month long adjournment in the case so that the office could familiarize itself with the facts of the cae. Petitioner consented, putting the matter back before the court on March 25th 2022.**

**2022 On or about March 14th** parties in Lopez v Hochul were discussing the case when Petitioner realized that Respondents had never halted, constructed or otherwise complied with the TRO issued on February 3rd. Parties immediately requested a conference before the court to clarify the scope of the TRO.

**2022 March 17th** Parties in Lopez v Hochul appear before Hon Judge Kimberly O'Connor for a conference in Lopez v Hochul during which the court clarifies and reiterated the existence of the TRO in the case. It is apparent based on the counsel for the Respondents that the TRO had not been adhered to up until that point. Petitioner made clear that she was considering filing a motion asking the court to find Respondents in contempt.

**2022 March 18th** (the next day) without any advance notice Respondent's counsel in Lopez v Hochul files an emergency OSC seeking to vacate the TRO which had been in place since February3rd. Petitioner objects to the proceedings being held before she can review the documents contained therein. The court agrees and Judge Hartman orders Respondent's counsel to provide Petitioner with copies of all documents, and sets the case for March 21st; ordering parties to appear in person for oral arguments related to the Emergency OSC.

**2022 March 21st** Parties in Lopez v Hochul  appear before Judge Hartman for oral arguments and, weighing the interest of justice in addition to parties arguments the court partially ("to an extent") lifts the TRO so that underground work related to "pipes and wires" may proceed, with the understanding that a judge had still not been officially assigned to the case. The matter was adjourned until March 25th, on which day the judge assigned to the case would be revealed.

**2022 March 22nd** Petitioner in Lopez v Hochul learns of The Salt Mines documentary released in 1992; which strengthened her case and arguments as they relate to the history and area in question, considerably.

**2022 March 24th** Petitioner in Lopez v Hochul files multiple motions, including for contempt against respondents, as well as a motion for leave to renew and reargue her positions in response to Respondents emergency OSC to vacate the TRO, considering the new information contained within The Salt Mines

**2022 March 25th** Judge Kushner, a civil court Judge located in Albany Family Court was assigned to the case Lopez v Hochul.

**2022 April 13th** The court granted Respondents' motion, vacating the TRO which had been in place and allowing construction at a site containing historic resources as defined by the NHPA to continue.

**2022 May** Petitioner in Lopez v Hochul sought and was granted a "delayed", or enhanced filing schedule, since she is pro se and also disabled.

I declare under penalty of perjury that the foregoing is true and correct.

Signed,

**MARIAH LOPEZ**

Dated: June 6, 2022

Plaintiff

Lopez v US DOI et al

708 Congress Street

Schenectady NY 12303

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK

_____

MARIAH LOPEZ                                                    **COMPLAINT & TRO**

V

U.S. DEPARTMENT OF THE INTERIOR,                    **INDEX NO_____**

NATIONAL PARK SERVICE,

HUDSON RIVER PARK TRUST,

NEW YORK STATE EXECUTIVE CHAMBER,

NEW YORK STATE DEPARTMENT OF PARKS

RECREATION & HISTORIC PRESERVATION,

_____


**COMPLAINT INCLUDING REQUEST FOR TRO & INJUNCTIVE RELIEF**

1.Plaintiff alleges the Defendants are in violation of:

**2.The United State's Constitution; First, Fourth, and Fourteenth Amendments (among others);**

**3.The Constitution of the State of New York; Article I, Sections (6)(8) and (11), among others;**

**4. The National Historic Preservation Act; Section 106, and The**

**New York State Historic Preservation Act; Sections (14.00), (14.07) among others.**

**United States Department Of Transportation Act; Section 4F among others;**

**5.New York State Human Rights Law (sections related to and prohibiting Retaliation, as well as discrimination based on race, and gender expression).**

**6.This case and controversy focuses on Historic Resources within Hudson River Park, which are threatened by construction at Gansevoort Peninsula; and how NYS SHPO failed to perform duties under Section 106 of the National Historic Preservation Act.**

7.Two factors determine whether or not a construction or development project falls under the jurisdiction of the National Historic and New York Historic Preservation Acts respectively;

8. Does the project involve federal agencies and or funds? In this case and controversy the answer is yes. The U.S. Army Corp of Engineers.

9. II Does the project negatively impact or have the potential to negatively impact, sites and properties listed or eligible to be listed on the National or State Register of Historic Places? Again, the answer from a legal and regulatory perspective, is yes.

10.The area of Hudson River Park between roughly Christopher Street and what is now referred to as Gansevoort Peninsula, **meets and satisfies** the statutory definition and requirements to be classified as a Historic Resource under the National Historic Preservation Act; **being the birthplace and incubator of a disproportionate amount of (Black, Lantino, Transgender and Gender Non Conforming; Gay and Lesbian) American heritage, history and culture when one considers the areas relatively small size.**

11. The area was first nominated and submitted to the Federal government for review and nomination ( which should have triggered cooperative efforts between Federal and State agencies to study the area further) by Plaintiff in 2014 during an initiative under former President Obama, in which the United States Department of Interior and the National Park Service conducted a national study of LGBT history and Historic Resources.

12. Since that time the area's rich history has only grown in notoriety, and as have the stories of national historic figures associated with it (The Death and Life of Marsha P. Johnson, released in 2017).

13. **Today, a massive 75 million dollar construction project at Gansevoort Peninsula, which required the approval of the United States Army Corp of Engineers (among other agencies, placing the project squarely under the jurisdiction of the National Historic Preservation Act) threatens Historic Resources located within Hudson River Park.**

14. Plaintiff argues that the Assessment of Potential Effect (APE) conducted by the New York State Historic Preservation Office, as part of the agencies legal requirements and related tasks under section 106 of the NHPA, relating to Gansevoort Peninsula (as well as any other pro forma or legally required input or involvement from the agency) was flawed, deficient, inadequate; intentionally misleading, is essentially racist, sexist, classist and transphobic, and that any reports or assessments created and produced by the Defendant's, including but not limited to SHPO, **are designed as a rubber-stamp approval process, which favors wealthy white developers and interests,** over what would be the more cumbersome and less lucrative task of years long study

of the layered an nuanced American heritage and Historic Resources located within Hudson River Park.

15. This history within Hudson River Park, although "*colorful*", tells a story of oppression, pain, and suffering of tens of thousands of Americans. Areas within the park tell the story of thousands (if not millions) of marginalization of TLBTQ+ **who are descendants** of enslaved individuals; indidenous people, and immigrants from equatorial regions across the globe (those with Black and Brown skin), who call NewYork home. Through a rich underground tradition of oral-history, they (Black and Brown folk) all "found" this place, The Piers, for five decades. People of color from across the globe, passed along a "secret": if you are in New York City, you go to The Piers to find your own people.

16. The history of the Black and Brown TLGBTQ+ people associated with specific areas within Hudson River Park **is historically and ethnically distinct from that of white TLGBQ+ individuals and communities**; including but not limited to language, customs and traditions.

**17. This history—and the Historic Resources associated with it— has been entirely ignored by Federal and State officials thus far where it clashes with construction plans within Hudson River Park.**

18. Even if SHPO did not find that Gansevoort Peninsula itself was a Historic Resource or eligible to be studied and listed on either the Federal or State Register of Historic Places (which Plaintiff vehemently rejects), **Plaintiff is prepared to prove that the agency (supposedly in**

compliance with Federal law and regulations under NHPA) failed to accurately list and assess every single aspect of history, culture and native tradition (ie Historic Resources) which are threatened by the construction project at Gansevoort Peninsula, and/or which are located within Hudson River Park (at the time the agency submitted its assessment approval for construction of a man made beach at the location).

19. For every project involving a federal agency, SHPO must collaborate in the creation of an Area of Potential Effect review, or APE.

20. As a part of this APR SHPO must review and assess: **all** areas impacted by the project which contain, and/or **which might contain Historic Properties, including Historic Resources, as defined by section 106 of the NHPA. The APE must assess and document all** foreseeable **adverse effects on Historic Properties, to the public, as well as to local communities. SHPO did not perform this function with regards to Gansevoort Peninsula.**

21. The view of the scenery (what can be seen and taken in with the naked eye), including the landscape (and in this case the waterfront), enjoyed by communities**, and whether this view has the potential to be radically altered and or adversely impacted by said construction, is subject to inclusion, scrutiny and review via APE.**

22. The Piers (45 and 46 respectively, referred to as The Piers globally and through literature and contemporary cinema) including their stunning views of the Hudson River, parts of New Jersey and Northern Manhattan, are being adversely impacted by construction at Gansevoort Peninsula.

23.Black and Brown  TLGBQ+ individuals and communities have been gathering; impacting national and global events (including helping to shape local, state and federal law; American history art and culture), **all while taking in a historic view which can only be viewed from The Piers,** decades prior to when wealthy white developers found the land and area appealing, ripe for gentrification.

24.The view from The Piers **will be forever altered if construction at Gansevoort Peninsula is allowed to continue under current plans, which is creating an artificial landscape,** completely foreign to the natural history and human culture, civilization which has developed organically in the area  over half a century.

25.**The value and quality of the local culture and history is threatened, and will be degraded and harmed irreparably by the imposing, artificial presence of a man made beach at Gansevoort Peninsula. Such an attraction will create a new socio-ethnic dynamic in the area. TLGBQ+ communities will be replaced by white cis, hetero sunbathers.**

**27.Little Discovery is Needed In This Case**

This case and controversy happens to be unique for several reasons: One being the fact that Plaintiff is already in possession of a large amount of documents and records which can be considered discovery material (sure to expedite this case), which strengthen her arguments and likelihood of succeeding on the merits. **Plaintiff could be ready for trial in a matter of months.**

28.Plaintiff came into possession of these records and documents after initiating a Special
Proceeding in Albany Supreme Court in February (Lopez v Hochul et al 781-22), challenging the
failure of New York State officials with regard to executing their duties as per
historic-preservation within Hudson River Park (related to the history and areas cited in this
case). Generally there is no Discovery in Special Proceedings, and as such filings would be
limited. However the Respondents (Defendants) submitted an inordinate amount of
documentation which Plaintiff might have never come to possession of otherwise.

29.After Plaintiff (Petitioner) secured a TRO against Respondents blocking construction within
the aforementioned areas within Hudson River Park while the court determined similar questions
highlighted within this case, Respondents counsel from the New York Attorney General's Office
filed an Emergency OSC to vacate the TRO. This motion **contained a vast number of exhibits
which did not factually strengthen Respondents' position at all. Rather, they only served to
undermine it. These filings also highlighted why any construction project at Gansevoort
Peninsula falls under section 106 of the Historic Preservation Act, since the U.S. The Army
Corp of Engineers is involved.**

30.In response to Respondent's Emergency OSC to vacate the TRO, the court heard oral
arguments on March 21st, and lifted the TRO, but only "**to an extent**" and after Respondents
argued that there was structural and engineering engineering work "underground" that needed to
be completed, **which would not impact the area above ground (visible to the public ie those**

at The Pier nearby); that the work involved "wires and pipes". More infrastructure than design.

31. The AG's Office argued that construction of the above ground design elements for the area would **not be completed for quite some time**; a matter of months and potentially next year if any major delays occur with the underground preparation work.

32. When the court agreed to lift the TRO "to an extent" in order to allow engineering work to proceed underground, it did so with the understanding that parties would soon be before yet another judge (the third), assigned to decide the case on its merits.

33. After further review of the massive amount of documents filed by the Respondents (Defendants) to support their motion to vacate the TRO, as well as relevant state and federal law, Plaintiff discovered inadequacies and revisionist history within the review and assessment process under SHPO; falsehoods with regards to historic events and figures listed in the documents (or lack thereof); deliberate refusal of state officials to correct-course over the years, even as the Historic Resources within the park (and other history covered under Section 106) became household names. Enter the death of a civil rights icon and American hero (Marsha P Johnson).

34. **Within these documents and records about Gansevoort Peninsula Petitioner (Plaintiff) supplied by Respondents (Defendants) within the Special Proceeding, it became apparent that zero consideration was given (by SHPO or Hudson River Park Trust) as to how**

**construction within certain areas of Hudson River Park will intersect with Black, Brown and TGNC history and culture; including how these intersecting construction plans adversely impact the historic and traditional use of the park by these communities, and or how it might threaten Historic Resources associated with the same.**

35.The history of this nation, unfortunately, includes innumerable incidents where wealthy white land holders and land owners (often times the government) decides that certain land is more valuable than other land for whatever reason. Then taking steps to displace Black and Brown communities; then erasing their history and culture. This case follows that pattern and is no different.

**36.Plaintiff does not violate principles of Res Judicata by bringing this lawsuit**

While the Special Proceeding in Albany is still pending at the time of this filing, Plaintiff (Petitioner) avoids violating well established principles of res judicata since there has been zero finding of fact within said Special Proceeding, nor has the court reached a decision merits relating to any of Petitioners (Plaintiff's) claims.

37.In addition, Plaintiff avoids violating res judicata since the cases, including their targets and relief sought, are not identical.

38.In the Special Proceeding Petitioner (Plaintiff) is suing New York State officials: In this case, she is suing the federal government and agencies as well, for failing to exercise their duties over those officials.

39. Having secured the large amount of documents and records which paint a clear picture of the actions and failures of all Defendants, only after initiating the Special Proceeding and fully discovering a timeline of events which includes failures and illegal actions by the Defendants regarding Hudson River Park as recently as 2019, Plaintiff has every right to use this plethora of damning proof to seek relief and enforcement of the National Historic Preservation Act in Federal Court.

40. Congress intended the Federal government, via the United States Department Of the Interior and the National Park Service to be the ultimate custodian and keeper of Historic Resources, not SHPO's.

41. Certainly Transgender civil rights pioneers Marsha P Johnson and Sylvia Rivera are national Historic Resources (more specifically the history, places/locations and other ephemera associated with them). The same is true for "Ballroom" and other Black Brown TLGBQ+ history and culture associated with The Piers. These Historic Resources are what this case is about.

**42. The United States Department of the Interior, National Park Service: failures to list and protect all Historic Resources as per the National Historic Preservation Act, especially those relating to Black, Latino and TGNC American History**

43.Since 2014–when then President Obama and the White House announced the NPS would conduct a study of LGBTQ+ events and history– the National Park Service has continuously failed to meet its obligation under the section 106 of the National Historic Preservation Act (among other mandates under the law): failing to identify, inventory, study and preserve historic sites within Hudson River Park, located in NYC, which meet the statutory elements of sites and historic under the auspices of the NHPA, especially sites and history related to poor and disabled members of the TLGBQ+ community (including sex workers).

44.Historic sites and resources within Hudson River Park include:

**a**. the location of the death of Marsha P Johnson (a national historic figure), known today as Gansevoort Peninsula; the location where her body was recovered from the Hudson River, both in July 1992;

**45.b**.The site where Sylvia Rivera's (a national historic figure) ashes were scattered in a massive public ceremony in 2002;

**46.c**.The location known widely (across the globe) as "The Piers' ', which is arguably the most culturally and historically significant piece of real estate for the BIPOC TLGBQ+ community, in the United States of America.

47.The Piers within Hudson River Park are the modern birthplace of the world famous Ballroom Community/Scene, including the dance phenomena known as Voguing. Voguing, as created and or perfected on The Piers, has spread as far as Russia, Ukraine, and Japan.

48. Without The Piers, the world would not have the art form known as Voguing, or have hit shows like POSE (on FX), or LEGENDARY (on HBO Max).

49. Mainstream musicians and artists which have been inspired by and/or have incorporated art and culture which stem from The Piers and/or Marsha P Johnson, Sylvia Rivera include:

50. Madonna, Ru Paul, Beyonce, Lady Gaga, Kelly Rowland, Brittany Spears, Teyanna Taylor, Sam Smith, Demi Lavato.

51. Phrases such as "Throwing shade" and "Spilling tea", have all entered the modern American as well as global English speaking lexicon, placing the history and culture which is derived from The Piers squarely within the domain of protections and mandates outlined within both the National and Historic Preservation Acts respectively. Culture, including language (or dialect) and tradition which are communication across decades; Art, music; Historic figures of national and global significance.

52. All these are associated with a relatively small section of Hudson River Park. This section of the park was an undesirable eyesore before the passage of the Hudson River Park Act in 1999 (the documentary film The Salt Mines, released in 1992, the same year NHPA was amended to include "Culture", as well as the year Marsha P Johnson died at the site, documented the lives of multiple TGNC sex workers who were homeless and who lived on or near what is now referred

to as Gansevoort Peninsula, finding shelter inside NYC Dept of Sanitation trucks parked along the water at the time.

53.Defendants Hudson River Park Trust only recently came into possession of the property several years ago.

54. This area–from Christopher Street to Gansevoort Peninsula on Manhattan's West Side–wasn't a pretty or desirable place to be for most. It was dangerous, structurally unsound, and it smelled awful most of the time. However, TGNC individuals were safer than elsewhere in the city or state. This says a lot about the history of New York, America and us as a society. This history has enormous value for socialists and historians.

55.This was a place where society's most marginalized and vulnerable groups found refuge, and also ended up influencing the entire planet.

**56.In February 2020 New York State Governor Andrew Cuomo announced that a park in Brooklyn would be named after Marsha P. Johnson.**

57.This announcement by the Governor made zero sense from a historic perspective, as Marsha P Johnson had no known connections to Brooklyn whatsoever.

58. Instead Marsha P Johnson has a well documented life and death association with Hudson River Park, in Manhattan.

59. Shortly after this announcement regarding a park to be renamed after Marsha P Johnson in Brooklyn, Plaintiff, joined by other activists and community groups, made clear her opposition.

60. Eventually this controversy forced Defendants the New York State Executive Chamber (Governor Cuomo himself), and New York State Department of Parks Recreation & Historic Preservation to make changes to plans for this park (adding more historically accurate content about the Trans-rights movement for instance).

61. As a result of the controversy and discourse sparked around Defendants plans for Marsha P Johnson State Park in Brooklyn (as well as an informal appeal of agency plans which I note key Black, Brown THNC history within Hudson River Park), Defendants NYS Executive Chamber, and the NYS Department of Parks Recreation and Historic Preservation made a commitment to Plaintiff to use state funds to renew and revive the public input process for Hudson River Park in order to finally honor Marsha P Johnson and Sylvia Rivera properly; in compliance with NHPA.

62. Plaintiff's continuing outspoken criticism of Governor Cuomo and staff working in the Executive Chamber, as it relates to the memory of Marsha P Johnson and Sylvia River, caused staff working for the Governor and in the Executive Chamber to retaliate against the Plaintiff; including but not limited to refusing to follow through placing Plaintiff at a paid position she was offered in 2019, to help her transition from SSI to the workforce (Plaintiff is disabled); defamation of character etc.

63. The resignation of New York State Governor Cuomo during the summer of 2021 provided "cover" for Defendants NYS Executive NYS Department of Parks, Recreation & Historic Preservation (those individuals who were expected to remain in their respective roles in state government even after Governor Cuomo's resignation, such as NYS Department of Parks Recreation and Historic Preservation Commissioner Erik Kullesseid) to back out of commitments to come into compliance with the NHPA, and, where the NYS Executive Chamber is concerned, failing to provide Plaintiff with the employment opportunity previously promised, as previously mentioned (Plaintiff had completed the entire hiring process at the time of the COVID-19 global pandemic, and had been assured by members of the NYS Executive Chamber that she would be placed in her job following the COVID-19-lockdown).

**64. Hudson River Park Trust, New York State Department of Parks, Recreation & Historic Preservation and Gansevoort Peninsula.**

65. From 2017 to the present Hudson River Park Trust has intentionally downplayed, threatened, destroyed, hid, and or erased valuable historic resources within Hudson River Park that are associated with Black, Brown TGNC American art, history and culture.

66. HRPT claims (falsey) that between 2017 and 2019 the agency conducted adequate and unbiased public proceedings in order to seek public comment and or criticism for new construction plans at Gansevoort Peninsula, located within Hudson River Park, supposedly to satisfy statutory requirements under state and federal historic preservation law.

67. During the period between 2017 and roughly 2019, Hudson River Park Trust intentionally excluded certain minority groups, communities, individuals and organizations (such as those who historically frequent the park, such as members of the public who are Black+Latino; 68.Transgender and Gender Non Conforming individuals; Members of the Ballroom Community/Scene; impoverished and homeless New Yorkers and visitors, as well as those with disabilities) from participating in ongoing, so-called public input sessions with regards to construction plans for Gansevoort Peninsula. This exclusion equates to race-based discrimination, at a minimum.

69. HRPT took these actions because groups such as as those mentioned above, including STARR (the Strategic Trans Alliance for Radical Reform fka Street Transvestite Action Revolutionaries) and FIERCE (Fabulous Independent Educated Radicals for Community Empowerment) have organized and protested the agency's disregard for invaluable TLGBQ+ history within the park for decades (FIERCE produced an award winning documentary called Fenced Out about this very issue in the early 2000's), as such the agency feared that these organizations and voices could derail plans for a man made beach designed to placate to wealthy (mostly white) residents.

70.Plaintiff is a founding member of FIERCE and is the volunteer Executive Director of STARR.

71. Plaintiff is also the chosen, or informally adopted daughter of Sylvia Rivera; as well as the individual responsible for the recent interest in the life and death of Marsha P Johnson, having

successfully petitioned law enforcement to re-examine the investigation into her death back in
2012.

72. Plaintiff has used this unique connection to Sylvia Rivera and Marsha P Johnson, to educate
the Defendants with regards to said history: Plaintiff has had direct communication with the
highest levels of all agencies named in this case except for the White House, regarding this
history. There is no way the Defendants can argue the history and the public records do not
support Plaintiff's claims that NPS, NYS Executive Chamber, NYS Dept of Parks Recreation &
Historic Preservation, HRPT have all been informed of the unique and easily verifiable historical
proofs associated with The Piers and Gansevoort Peninsula.

73. In 2014 Plaintiff was invited to and did attend an inaugural event to mark the beginning of a
study of national landmarks related to LGBTQ+ American history.

74. The invitation came from the offices of the then Secretary of the U.S. Department Of the
Interior Sally Jewel.

75. At the event Plaintiff made her voice heard at this event on behalf of Black and Brown
TGNC individuals. Plaintiff has recently uncovered a short video which documents Plaintiff
urging the all white, all cisgender panel of historians named to advise with regard to this new
study, to consider "Trans women of color" as a central part of the study.

76. At this event or shortly thereafter Plaintiff became acquainted with one Ms Barbara Little of the NationalPark Service, and corresponded with her for years related to the study and importance of the NPS preserving Black, Brown TGNC history and the areas within Hudson River Park.

77. Between 2014 and 2016 Plaintiff did attend multiple public meetings hosted by the NPS with regards to this study under President Obama.

78. Plaintiff submitted and presented testimony in favor of the agency (DOI via NPS) taking further steps to study and preserve Black, Brown TGNC history within Hudson River Park.

79. Somehow Defendants DOI and NPS (under the all white, all cisgender leadership and historians) chose the Stonewall Inn. This seems to be the complete opposite of what the President seemed to outline in public statements issued at the beginning of the study.

80. In June 2016 Plaintiff wrote to President Obama after Defendants DOI and NPS seemed to ignore the President's instructions in ordering the study of LGBTQ+ historic sites: The President had placed an emphasis on history and sites which were frequently overlooked in the telling of the American struggle for TLGBQ+ equality. Plaintiff sent her letter to the White House using an age-old tactic to ensure it would be open: she sent dozens of copies of the letter in a series of rainbow envelopes, just in time for Pride Month.

81. In response to her letter to President Obama, Plaintiff did receive a polite reply letter from the White House months later, vaguely acknowledging the importance of The Piers, and encouraging her to continue working with NPS to nominate additional sites, which she did.

82.Thus far Defendants have ignored both the Plaintiff and other experts in history concerning the invaluable history associated with and located in Hudson River Park.

83. HRPT continues to mislead state and federal agencies with regards to the American History and Culture (specifically Balck, Brown and TGNC history) connected to and located within Hudson River Park; Doctoring internal documents and records so that construction can continue and a wealthy developer (or developers) can continue construction of a $75 million dollar man made beach and soccer field at Gansevoort Peninsula

84. In 2021 Hudson River Park Trust along with the New York State Department of Parks Recreation & Historic Preservation announced plans for construction of a man made beach within Hudson River Park, which are based on plans and approvals from the U.S. Army Corp of Engineers which date back to the early to mid-1990's.

85. In addition to violating the NHPA, these plans are also in violation of the USDOT Act section 4(f).

86. This construction/development of Gansevoort Peninsual was orginally outlined within the Hudson River Park Act, signed into law in 1999, decades before TGNC individuals were

afforded civil protections and protected status due to centuries of discrimination, violence and abuse.

87. The Hudson River Park Act, including the establishment of the Hudson River Park Trust (made up of well connected political appointees of the Mayor and Governor), are products of *Old Albany,* that of a bygone era. One in which it is likely that those who championed the legislation (GOP leadership in Albany and NYC) cared little for Black, Brown, TGNC history.

88. It is also likely that those in Albany in 1999 may have had interests outside of the People's business in mind when envisioning development of the waterfront: The vendor contracts and bids associated with development within and along Hudson River Park are staggering. The foreseeable kickbacks and bribes imagined or entertained by politicians in Albany in the 1990's, were probably the same.

89.These plans for a man made beach i.e. development at Gansevoort Peninsula, have had a sporadic history and schedule. The initial Environmental Impact Statement for the project was completed in the 1990's, with the project stalled or staggered (without apparent reason) for decades until an accelerated pace was initiated by Defendants HRPT and New York State Department of Parks Recreation & Historic Preservation in approximately 2017, 2018.

90.Within the intervening decades (1990's through the present), the United States of America has undergone a radical transition..in terms of how Transgender Americans are viewed, treated and

protected by the Court, law, society and in the media. The same is true for Black and Brown Americans.

91.The plans for construction for Gansevoort Peninsula announced by HRPT are inconsistent with the intent behind NHPA, since it is widely accepted today that individuals and groups associated with this area of Hudson River Park are some of the most influential in American History, bar none. NHPA is designed to advance the study, preservation and consideration of more than just "ancient" burial sites, historic facades and unique architecture: certainly the location believed to be the location where the most impactful Black Transgender individuals in American history, qualifies for preservation under the NHPA.

92. Since 2021, the NPS has abandoned its responsibilities under NHPA, to assess, protect and preserve all historic resources of national import, specifically those located within Hudson River Park, especially relating to Gansevoort Peninsula.

93. Instead, the NPS has chosen to limit the scope of its work and preservation to sites like Stonewall, which does not capture the true history of Black, Brown and TGNC Americans and their struggle for civil rights in New York and across America.

94.Plaintiff will Suffer Irreparable Harm if a TRO is not Granted
Plaintiff, having lost her biological mother at age eight, and then losing Sylvia Rivera, her adopted or "chosen" mother at a relatively young age as well, is desperate to force the

Defendants to engage in good faith due diligence concerning the vital history related to Sylvia Rivera, Marsha P Johnson and Gansevoort Peninsula.

95. Without relief she will face and experience a second loss of sorts with regards to Sylvia Rivera, who along with Marsha P Johnson referred to the Hudson River as the River Jordan. This location–Gansevoort Peninsula–was once the chosen home of Plaintiff's mother. Plaintiff will be burdened with psychic pain and a sense of personal loss, including part of her own identity, which may never be restored.

96. For Plaintiff, a former ward of the state and foster youth who worked on the film Fenced Out in the late 1990's, a part of her personal sense of identity, as well as heritage and Pride. For Transgender teens (as Plaintiff once was) there is a love which a Trans-mother can provide.

97. Sylvia Rivera saved my life..from the streets and from suicide as a teen.

98. Sylvia Rivera, and the Historic Resources at the core of this case, saved the Plaintiff'slife (from the streets, and from teen suicide), and she, or "Ma" as she preferred to be called,  the potential to save far more, if her legacy and history are protected preserved.

99. Plaintiff and countless others who may wish to enter into the fields of sociology, or anthropology, in order to study this unique part of New York and American history, will be unable to do so.

100.Thousands if not millions of people share a history and culture which is being threatened by the actions and failures of the Defendants.

101.WHEREFOR the Plaintiff DEMANDS to following Injunctive Relief, as well Punitive and Compensatory Damages:

102.**Relief**

**103. Plaintiff is Seeking a TRO against the Defendants Hudson River Park Trust, and the New York State Department of Parks Recreation and Historic Preservation.**

104.Plaintiff asks this court to issue a Temporary Restraining Order against the Defendants, barring continued construction within Hudson River Park between Christopher Street and Gansevoort Peninsula until this court can hear parties on the merits.

105.**Injunctive Relief**

106.**Plaintiff asks this court to grant Injunctive Relief in this case. Plaintiff requests an an Order: Directing the Defendants to conduct an internal review related to;**

   **I.**  the location of the death of Marsha P. Johnson; where her body was recovered in 1992.

  **II.**  The location where the ashes of Sylvia Rivera were scattered within Hudson River Park in 2002

III.   All historical information related to the Ballroom Scene, the longest running art collective of TLGBQ+ artists in United States history, and its relation, if any, to Hudson River Park;

IV.   Defendants will study whether modern Ballroom Scene, including its fraternal cohorts known as "Houses" can indeed trace their origins back to two individuals (siblings) formerly enslaved, named William Dorsey and Daniel Swann;

V.   Defendants are directed to provide Plaintiff, the court and the public, a written determination and explanation, ***rooted in the historic facts and scientific expertise at the disposal of the Defendants***, as to why the aforementioned historical figures, their cultural descendants, and the structures known as The Piers and Gansevoort Peninsula, ***do not qualify*** as Historic Resources under both the National Historic Preservation Act, ***by July 6th, the anniversary of the date Marsha P Johnson's body was recovered from the Hudson River in 1992).***

## 107. Punitive and Compensatory Damages

Plaintiff is also seeking unspecified Punitive and Compensetory damages from Defendants Hudson River Park Trust, the New York State Executive Chamber, and the New York State Department of Parks Recreation & Historic Preservation, discrimination on the basis of:

Race, Sex, Gender Expression, Disability; Retaliation, Defamation of character, Employment Discrimination violation of:

108. ***The United State's Constitution; First, Fourth, and Fourteenth Amendments (among others)***;

109. *The Constitution of the State of New York; Article I, Sections (6)(8) and (11)*, among others;

110. *Title VII of the Civil Rights Act of 1964*

111. *Title I and II of the Americans with Disabilities Act of 1990*

112. *Human Rights Laws of both the City and State of New York respectively.*

113. *In addition to State and Federal laws prohibiting Defamation, Libel and Slander.*

Respectfully Submitted

MARIAH LOPEZ

Plaintiff Pro Se

June 3rd 2022

MARIAH LOPEZ

708 CONGRESS STREET

SCHENECTADY NY 12303

C.2124709687

Mariah4change@gmail.com